In The United States District Court For The Western District of Virginia

Jason Clem,
   Plaintiff,

v.                       Civil Action No. 7:10-cv-00169-sgw-mfu

H. Clark, John Jabe, Larry B. Collins,         Jury Trial Demanded
sued in their individual and official capacities,
and Gene Johnson, Benjamin A. Wright, Dewey Jennings,
John Garman, Robert Bivens, Bryan Watson, Brenda J. Ravizee,
Major J. Combs, Lt. B. Collins, Sgt. Cochrane, Sgt. B. Young,
Sgt. D. Greer, Lt. D. Collins, Officer Roberts, and John and
Jane Does, sued in their individual capacities,
   Defendants.

### Second Supplemental Civil Rights Complaint

This is a civil rights action filed by Jason Clem, a state prisoner, for damages, injunction and declaratory relief under 42 U.S.C. §1983, 42 U.S.C. §1985 and 42 U.S.C. §2000cc (Religious Land Use and Institutionalized Persons Act), alleging censorship of: 74 publications, non-music cd's, cd's with the "parental advisory: explicit lyrics" label, and cd's not ordered from Jones Express Music; in violation of the Free Speech/Free Exercise Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the RLUIPA; the deprivation of property, in violation of the Due Process Clause of the Fourteenth Amendment; and retaliation and conspiracy to retaliate for filing this lawsuit and numerous grievances, in violation of the First Amendment.

### Jurisdiction

The Court has jurisdiction over the plaintiff's claims of violation of federal Constitutional rights under 28 U.S.C. §§1331, 1343(a)(3).

## Parties

1. The plaintiff, Jason Clem, has been incarcerated at Wallens Ridge State Prison (WRSP) since February 17, 2006 and the relative events in this complaint took place while he was there.

2. H. Clark is the Director of the Virginia Department of Corrections (VDOC). Under the Code of Virginia sections 53.1-25 and 53.1-35 it is his responsibility to make general rules and rules regarding publications. He is sued in his individual and official capacities.

3. John Jabe is the Deputy Director of Operations. He has many functions relating to publications including the final authority to approve or disapprove. He also issues new policies. He is sued in his individual and official capacities.

4. Larry B. Collins is the chairman of the Publication Review Committee (PRC). He makes decisions to approve or disapprove publications. He is sued in his individual and official capacities.

5. Gene Johnson is the former Director of the VDOC. He is sued in his individual capacity.

6. Benjamin A. Wright is the former chairman of the PRC. He is sued in his individual capacity.

7. Dewey Jennings was or is a member of the PRC. He is sued in his individual capacity.

8. John Garman is Director of the Western Region of the DOC. He responds to Level II Grievance Appeals. He is sued in his individual capacity.

9. Robert Bivens is the Ombudsman for the Western Region. He investigates Level II Grievance Appeals and reviews intake decisions. He is sued in his individual capacity.

10. Bryan Watson is the former Warden at WRSP and current Warden of Nottoway Correctional Center. He is responsible for Level I Grievance responses. He also makes decisions whether to approve or disapprove publications. He is sued in his individual capacity.

11. Brenda J. Ravizee is the Grievance Coordinator for WRSP. She is responsible for investigating Level I Grievances and logging Grievances during intake. She is sued in her individual capacity.

3.

12. Major J. Combs is the Chief of Security at WRSP. He regularly acts as the Facility Unit Head's Designee for purposes of approving or disapproving publications. He is sued in his individual capacity.

13. Lt. B. Collins (formerly Sgt. B. Collins) was the head of the property department. She made decisions whether to approve or disapprove publications. She is sued in her individual capacity.

14. Sgt. Cochrane is a building sergeant at WRSP. He is sued in his individual capacity.

15. Sgt. B. Young is the current head of the property department. She is sued in her individual capacity.

16. Sgt. D. Greer is a building sergeant at WRSP. He was previously the building sergeant for B-building with building lieutenant D. Collins being his immediate supervisor. He is sued in his individual capacity.

17. Lt. Dennis Collins is the B-building lieutenant at WRSP. He also acts as the Officer-in-Charge for certain Disciplinary Offense Reports and answers some informal complaints. He is related, through marriage or blood, to Lt. B. Collins. He is sued in his individual capacity.

18. Officer Roberts was the B2 pod floor officer at WRSP. His immediate supervisor was Sgt. D. Greer. He is sued in his individual capacity.

19. John and Jane Does are various VDOC employees responsible for disapproving any of the challenged publications, upholding one of those decisions, making the decision to censor non-music cds, explicit lyric cds, and cds not ordered from Jones Express Music (JEM) and anyone involved in the conspiracy to retaliate against the plaintiff. They cannot be identified at this stage of the proceedings. They are sued in their individual capacities.

4.

<u>Facts</u>

20. On Monday, January 12, 2009 Sgt. Cochrane and another officer conducted a routine search of Clem's cell, D322, at approximately 7:00 pm.

21. During the search Sgt. Cochrane sarcastically remarked about a Bible sitting atop loose pages of the Dungeons and Dragons book "Draconomicon".

<u>Deprivation of Property and Unconstitutional Censorship</u>

22. Sgt. Cochrane then knowingly and intentionally removed the book from the cell and placed it on the tier.

23. Clem asked Cochrane why he was confiscating the book.

24. Cochrane responded that it was a Dungeons and Dragons book and we weren't allowed to have Dungeons and Dragons books.

25. Clem protested and informed Cochrane that the book was not on the Disapproved Publications List.

26. Cochrane relented a bit and said he was going to give the book to the property department to see if Clem could have it.

<u>Failure to Give Process Due</u>

27. Cochrane never gave Clem a Notification of Confiscation of Property form.

28. Clem asked Cochrane what was up with his book after not hearing anything from the property department.

29. Cochrane told Clem that the property department had the book now and he should write them.

30. On Monday, January 19, 2009 Clem sent a Request for Information to the property department inquiring about the publication. (see Exhibit D, page1)

31. On Wednesday, January 28, 2009 Sgt. B. Collins responded to the Request stating that property did not have any information concerning the book. (see Exhibit D, page1)

32. On Sunday, February 1, 2009 Clem filed an informal complaint concerning the lost book and failure to follow procedures.

33. No receipt was issued within two days as Operating Procedure 866.1 (Offender Grievance Procedure) requires.

34. On Tuesday, February 10, 2009 Clem filed a Grievance concerning the lost book and failure to follow proper procedures. Clem explained his Feb. 1 efforts to resolve the issue informally. (See Exhibit D, page 2)

35. On Friday, February 13, 2009 Grievance Coordinator Brenda J. Ravizee returned the Grievance during intake and informed Clem to resubmit an informal complaint since none was received. (See Exhibit D, page 2 reverse)

36. On Wednesday, February 18, 2009 Clem resubmitted an informal complaint concerning the lost book and failure to follow proper procedures. (See Exhibit D, page 3)

37. On Wednesday, March 4, 2009 Clem received a response to the complaint which stated the book had been found but determined to be not allowed. Sgt. B. Collins gave the decision to disapprove. (See Exhibit D, page 3)

38. On March 4, 2009 Clem submitted a Grievance concerning the disapproval of his book by Sgt. B. Collins. (See Exhibit D, page 4)

39. On Friday, March 6, 2009 Ravizee returned the Grievance during intake for the 30 day filing period being expired. (See Exhibit D, page 4 reverse)

40. On Tuesday, March 10, 2009 Clem submitted another Grievance on the disapproval of his book and clearly stating that it was challenging the Feb. 27th disapproval and not the Jan. 12th deprivation. (See Exhibit D, page 5)

41. On Thursday, March 12, 2009 Ravizee returned the Grievance during intake for the 30 day filing period being expired for the "property taken Jan 12th" (See Exhibit D, page 5 reverse)

42. On March 12, 2009 Clem sent Ravizee a letter inquiring why he was not allowed to grieve the Feb. 27th disapproval even though the Jan. 12th deprivation was not being challenged. (See Exhibit D, page 6)

43. On Tuesday, March 17, 2009 Ravizee responded to the letter stating "you had 30 days to file on property taken on 1-12-09". (See Exhibit D, page 6)

6.

44. On Wednesday, March 25, 2009 Clem was notified by B. Collins that he had to dispose of his book. (See Exhibit D, page 7)

## Unconstitutional Reason for the Censorship

(See the Affidavits of Jason Clem, Jesse Clem, Lori Richardi, and Greg Richardi located in the Appendix)

45. On Saturday, July 4, 2009 at approximately 10:00 am, during a visit with Lori Richardi and Jesse Clem, Clem had a conversation with Lt. B. Collins, the woman that had disapproved his book.

46. During the conversation Clem had to remind Collins about the book. As soon as she was told the book was about dragons she immediately remembered why she had disapproved it.

47. Collins told Clem, in front of his visitors, that she had orders from Major J. Combs to disapprove all Dungeons and Dragons books regardless of the content and that she was to make up a reason to disapprove them.

48. Collins further explained the specific reason she uses for disapproval is that the books instruct you to inflict pain on others. She said that she does not really believe they instruct that but she uses that as her reasoning.

49. Collins told Clem that there was nothing that he could do here [at WRSP] and that it would stir things up with the Major.

50. On Monday, September 7, 2009 at approximately 10:00 am, during a visit with Lori and Greg Richardi, Clem had another conversation with Collins.

51. Collins once again told Clem, in front of his visitors, that Combs had issued verbal orders to all officers to disapprove all Dungeons and Dragons books.

52. Collins further explained that Combs does not like the books and does not want them at his institution.

53. Clem asked if she thought Combs would put down the orders on paper upon my request to him.

54. Collins answered that Combs might but expressed doubt that he would.

55. Clem immediately asked Collins if she would be willing to write down what she had said.

56. Collins said "no" without hesitation. She further explained that she had been doing this for almost 20 years and that she had a family to feed.

57. Collins then told Clem to write property officer Buckles and that he might write it all down. She explained that he was out sick at that time but should be back soon.

58. That night Clem sent a Request For Information form to Buckles. No response was ever received back.

## Denial of Orders for 73 Publications

59. Clem has tried to order the 73 Publications listed in Second Amended Exhibit A, pages 1-2. The orders were denied because the books are on the disapproved publications list. (Also see Exhibit I)

60. Publications on the disapproved publications list are not allowed to be ordered by any inmate and this is a VDOC statewide prohibition.

61. Any order for a book on the list will be disapproved and returned to the inmate, just as Clem's orders were.

62. The 73 publications that Clem tried to order all appeared on the Disapproved Publications List at the time he tried to order them.

63. H. Clark is authorized under the Code of Virginia (Section 53.1-35) to proscribe reasonable criteria for disapproving publications. Pursuant to O.P. 803.2 (Incoming Publications) Section V. G. 3. b, he has the authority to veto PRC actions. He is ultimately responsible for all disapproved publications.

64. John Jabe issued O.P. 803.2 which sets forth the criteria for disapproving publications. His position is the office of primary responsibility for publications. He appoints the PRC members, and has the authority to veto PRC actions. He hears all Level II Grievance appeals on disapproved publications and has upheld the disapproval of many of the publications challenged here.

65. Gene Johnson had many of the same duties as H. Clark, above, when he was Director. He also issued Directive 803 (Offender Correspondence, Publications, and Telephone Access)

66. Larry B. Collins, the PRC chairman, has taken part in the disapproval of some of the challenged publications.

67. Benjamin A. Wright, a former PRC chairman, has taken part in the disapproval of some of the challenged publications.

68. Dewey Jennings, a current or former PRC member, has taken part in the disapproval of some of the challenged publications.

69. John and Jane Does include any PRC members, current or former, that are responsible for the disapproval of any of the challenged publications.

70. Bryan Watson was the Facility Unit Head at WRSP. He has some responsibility to disapprove publications and to hear appeals of those decisions. He has disapproved some of the publications and upheld their disapproval on appeal.

71. Brenda J. Ravizee investigates Level I publication Grievances at WRSP pursuant to O.P. 866.1 (Offender Grievance Procedure). Her investigations have supported the disapproval of some of the challenged publications.

72. Major J. Combs often fills in as the Facility Unit Head's Designee for purposes of disapproving publications. He conspires with other officers, such as Coehrane and B. Collins, to unconstitutionally disapprove Dungeons and Dragons books. He has disapproved some of challenged publications.

73. John and Jane Does includes any DOC employee who has disapproved or upheld on appeal the disapproval or conspired with others to disapprove any of the challenged publications.

74. The disapproval of the challenged publications affects Clem personally because he wants to exercise his First Amendment rights by ordering the books but he cannot because the actions of the defendants.

### Unreasonableness and Exaggerated Response To Prison Concerns

75. On March 6, 2009 the PRC approved the novel 'Dragon Lance Chronicles, "Dragons of Winter Nights"'. That book is written by the same authors and is very similar in content to book #10 of Exhibit A. It involves the same characters and places. (See Exhibit E, page 1)

76. On September 17, 2008 the PRC approved 'Star Wars (Roleplaying Game) Secrets of Naboo'. That book is very similar in content and theme and is a book in the same series as books #65 and #66 of Exhibit A. Also, as a roleplaying game book it is generally related to most of the books on the list as they are also role playing game books. (See Exhibit E, page 2)

77. On September 17, 2008 the PRC approved the publication 'Noble Knights Games'. That is the exact same publication as book #51 of Exhibit A. (See Exhibit E, page 2)

78. On June 18, 2008 the PRC approved the publication 'Llewellyn's New to AZ Horoscope Maker and Interpreter, 2006. That is the exact same publication as #45 of Exhibit A. (See Exhibit E, page 3)

79. On March 15, 2007 the PRC approved the book 'The Mongoose Modern Pocket Handbook'. That book is very similar and in many places identical to books #20 and #30 of Exhibit A. Also, as a roleplaying game book it is generally related to most of the books on the list as they are also roleplaying game books. (See Exhibit E, page 4)

80. On March 15, 2007 the PRC approved the book 'Mongoose Pocket Game Master's Guide'. That book is very similar and in many places identical to books #19 and #25 of Exhibit A. Also, as a roleplaying game book it is generally related to most of the books on the list as they are also roleplaying game books. (See Exhibit E, page 4)

81. On August 12, 2010 the PRC approved the publications 'Hyperion War Game' and 'Hyperion War Game: Kingdom Maintenance'. These books, as roleplaying game books, are generally related to most of the books on the list as they are also roleplaying game books.

82. The following publications appeared in the October 2008 Disapproved Publications List but were removed (on appeal?) after they were determined to pose no risk to any penological interests: 'Kender, Gully Dwarves, and Gnomes', 'Love and War Vol. III', 'Test of the Twins Vol. II', 'The Annotated Legends', 'The Dragon's Son', 'Time of the Twins Vol. I', 'War of the Twins Vol. II' [all authored by the same authors as book #10 and includes 3 books in the same series as book #10], 'Dungeon "Collector's Issue"', 'Dungeons + Dragons "Dragon 26th Anniversary Issue"', 'Dungeons and Dragons—Complete Adventurer by Jesse Decker 2005', 'Dungeons and Dragons—Complete Champion by Ed Stark + C. Thomasson 2007', 'Dungeons and Dragons—Complete Mage by Skip Williams + Penny Williams 2006', 'Dungeons and Dragons "Dragon, War, Incursion"', 'Dungeons and Dragons The Shackled City by Jesse Decker 2005', 'Mistress of Dragons by Margaret Weis 2003', 'Nightsword by Margaret Weis 1998', 'Masters of Dragonlance Art 2002', Forgotten Realms: 'The Black Bouquet by Richard Lee Byers'

'The Fallen Fortress by R.A. Salvatore', 'The Priest, Queen of the Depths by Richard Lee Byers', 'The Ruin, The Year of the Rogue Dragons #3 by Richard Lee Byers 2006', 'The Yellow Silk by Don Bassingwaite', 'Windwalker, Starlight & Shadows 3 by Elaine Cunningham', 'The War of the Rings - The History of the Lord of the Rings (J.R.R. Tolkien) Part III'.

83. Some of the publications are written by the same authors, have the same content, characters and places, and are roleplaying game books, just like some of the challenged publications.

84. The prison library has many books similar to book #8 [10] of Exhibit A. These include at least 18 books by the same authors and similar content including some of those listed above that were determined to pose no risk. Two of the books belong to the same trilogy as book #10.

85. The prison library has 'Dungeons and Dragons Eberron Explorer's Handbook'. This book is similar in content to the other Dungeons and Dragons books, especially book #4 and #46 of Exhibit A. It is a roleplaying game book.

86. The prison library has 'Battlelords of the 23rd Century', a roleplaying game book similar to books #5, #6, #8, #47, #48, #63 of Exhibit A.

87. The books 'Ulysses by James Joyce' and 'Lady Chatterly's Lover by D.H. Lawrence' were determined by the U.S. District Court for the Western District of Virginia to pose no risk to VDOC penological interests.

88. The prison has many novels of the fantasy genre including some Dungeons and Dragons, Forgotten Realms, Dragonlance, and Lord of the Rings novels that have many of the same characters, places, themes, and content as most of the Dungeons and Dragons books of Exhibit A.

89. The prison t.v. channels include the SyFy channel which plays many fantasy movies including 'Dungeons and Dragons: Wrath of the Dragon God', which is very similar in theme to the Dungeons and Dragons books of Exhibit A.

90. Inmates are permitted to watch any show or movie on the t.v. channels we have regardless of violence, sexual content, drugs, or any other content.

91. Each publication expresses unique views that are no longer available. Inasmuch that they are deemed to express similar views, the extent of the disapproval effectively restricts those views.

II.

92. The challenged publications do not contain instructions or information regarding the manufacture, simulation, or concealment of weapons, ammunition, explosives, incendiaries, or escape devices.

93. The challenged publications do not contain instructions or information regarding the ingredients or manufacture of poisons, drugs, intoxicants, abrasives, corrosives or other toxic or illegal substances.

94. The challenged publications do not contain instructions or information regarding the ability to physically disable, injure, or kill a person.

95. The challenged publications do not contain material, documents, or photographs that emphasize depictions or promotions of violence, disorder, or criminal activity in violation of state or federal laws or the violation of the Offender Disciplinary Procedure.

96. Rules prohibiting inmates from bringing certain items, including the challenged publications specifically or role playing game books generally, out of their cells is a possible easy way to meet whatever the regulation's goal might be, at a de minimis cost.

97. Creating a rule prohibiting the playing of role playing games is a possible easy way to meet whatever the regulation's goal might be, at a de minimis cost, but allow possession of the challenged publications.

98. Disapproving the "core rulebooks", without which the game cannot be played, but allowing the other challenged publications, is another possible easy way to meet whatever the regulation's goal might be, at a de minimis cost.

99. Any combination of the alternatives suggested is a possible easy way to meet whatever the regulation's goal might be, at a de minimis cost.

100. None of these suggestions is necessary as the challenged publications pose no risk to any VDOC penological interests.

## Unconstitutional Censorship of Non-Music CDs

101. On August 11, 2009 John Jabe announced that offenders will no longer be allowed to purchase non-music cds. He notes that this prohibition includes books, speeches, educational, and religious materials. (See Exhibit F, pages 1+2)

102. The overbroad policy circumscribes a substantial amount of constitutionally protected conduct as there are thousands of non-music cd's that are prohibited due to the policy.

103. The overbroad policy prohibiting all non-music cd's is not reasonably related to any legitimate penological interest.

104. Harold Clark is authorized, pursuant to Code of Virginia Section 53.1-25, to make reasonable rules regarding inmates, such as the prohibition of non-music cd's.

105. Gene Johnson had the same authority as Harold Clark and he was the director when the policy was issued.

106. On August 24, 2009 Clem tried to order 6 non-music cd's including the Bible on cd. (See Exhibit G)

107. On August 26, 2009 Clem's order was denied and returned by Sgt. B. Young because of the new policy. (See Exhibit G)

108. Clem is a Seventh-day Adventist (protestant christian) who requires the Bible to practice his religion. Denial of the Bible on cd substantially burdens this because it is easier to understand the Bible when read to Clem and he misses many key points by having to read it.

109. As part of Clem's religion he is expected to live in a holy manner in all aspects of his life. To do so he needs guidance such as that which the cd 'There's A Spiritual Solution To Every Problem' would provide. The denial of that cd (and all similar ones) burdens his religion because he cannot receive the guidance he needs to live in a holy manner.

<u>Unreasonableness and Exaggerated Response to Prison Concerns</u>

110. The prohibition counters the DOC's stated goal of rehabilitation by depriving inmates beneficial books, speeches, <u>educational and religious materials.</u>

111. Inmates are allowed to keep the non-music cd's they already possess, without ever having them reviewed by the VDOC for content, and regardless what the specific non-music cd is.

112. Inmates with tape players may keep and continue to order non-music tapes.

113. Inmates may not order books on cd but can order the actual books.

114. According to Jabe, the VDOC provides inmates with other reasonable opportunities to exercise our educational and religious rights. (See Exhibit C, page 6)

115. Allowing inmates alternative means of exercising their educational and religious rights is not a legitimate penological interest in depriving them of their constitutional right to exercise those rights with non-music cd's.

116. The non-music cd policy is content based and prohibits a whole category of cds without an individual determination.

117. The policy would be the equivalent of prohibiting all non-fiction books based on content but without an individual determination.

118. Under the policy many cds are prohibited that pose no risk to security, good order, or discipline of institutions or the rehabilitation of offenders. (ex. the Bible)

119. There are many non-music cds that are unavailable on other mediums and therefore unavailable to inmates.

120. Since many inmates already possess non-music cds, allowing other inmates to possess them would have not have any affect on other inmates, especially cds like the Bible.

121. Allowing inmates to order non-music cds could have the ripple effect of rehabilitating inmates since many non-music cds are beneficial to inmate rehabilitation.

122. Since the purchase and possession of non-music cds made up only a very small percentage of all cds (when inmates were allowed to order them), an easy alternative to the regulation, at a de minimis cost, would be to review controversial non-music cds (as they do with books, magazines, music cds, etc.).

123. An easy alternative to the regulation, at a de minimis cost, would be to ban all non-music cds with the same names as books, magazines, brochures, etc. on the Disapproved Publications List.

124. An easy alternative would be to approve certain non-music cds or categories of non-music cds, as they are currently doing with certain non-music religious cds.

125. Any combination of these alternatives could meet the regulations goals.

14.

## Equal Protection Violation

126. Clem is similarly situated to other inmates of his security level that are housed at the same institution.

127. Clem is dissimilarly treated to those inmates who are allowed to possess non-music cds, especially those specifically denied to Clem.

128. As Clem does not currently possess any non-music cds, he will not be allowed to ever possess any non-music cds.

129. There is no risk to security, good order, or discipline of institutions or offender rehabilitation by allowing some offenders to possess non-music cds but not Clem.

## Unreasonableness and Exaggerated Response to Prison Concerns

130. Operating Procedure 802.1 (Offender Property) specifically mentions that inmates will not be allowed to have any non-conforming property grandfathered in. The non-music cd policy contradicts this OP.

131. Inmates with tape players may keep and continue to order non-music tapes.

132. Allowing all inmates to possess non-music cds would relieve tension between inmates created from the unequal treatment the policy creates.

133. The policy restricts possession of all non-music cds for Clem and allows him no alternative means of exercising those rights.

134. An easy alternative that would not dissimilarly treat inmates but satisfy the (alleged) goal of the policy would be to allow no inmates to possess non-music cds or tapes.

135. Defendants Jabe, Garman, Bivens, Watson, and Ravizee were all involved in Clem's non-music CD Grievance. (See Exhibit C, pages 1-6) The constitutional violation was detailed to them but they did nothing to stop it or fix it when they had a duty to protect Clem's constitutional rights. They had the authority to remedy the Grievance.

## Unconstitutional Censorship of Explicit Lyric CDs

136. On January 26, 2009 the VDOC issued a policy prohibiting the purchase/order of any CD with the "Parental Advisory: Explicit Lyrics" label.

137. Clem has tried on at least three occassions to order explicit lyric CDs but cannot due to the policy.

138. Clark (and previously Johnson) has the authority to make such a policy.

139. Jabe issued this policy.

### Unreasonableness and Exaggerated Response to Prison Concerns

140. Inmates are permitted watch t.v. shows and movies that have many "explicit" words.

141. Prison officials often rent movies with "explicit" words and content.

142. Prison officials and inmates routinely use "explicit" language.

143. Inmates are permitted to receive letters that include "explicit" language and could even receive lyrics to songs in printed form that we cannot order in audio form.

144. Inmates can sing songs which would not be permissible to order.

145. Many library books contain "explicit" language. We are permitted to read and order such publications.

146. The CDs are not individually reviewed to determine whether they pose a risk to security, good order, or discipline or offender rehabilitation.

147. The policy allows inmates to keep the explicit lyric CDs already in their possession regardless of their content.

148. Allowing all inmates to ~~be~~ purchase explicit lyric CDs will relieve tension from dissimilar treatment created by the policy.

149. An easy alternative, at a de minimis cost, would be to review all CDs with the "Parental Guidance: Explicit Lyrics" label to individually determine if they pose a risk to security, good order, or discipline or offender rehabilitation. The VDOC already reviews certain CDs in this manner and places them on a disapproved list. The Wisconsin DOC has a policy such as this. (See Betts v. McCaughtry 827 F.Supp. 1400 (W.D. Wis 1993))

## Unconstitutional Interference with Communication and Receiving Information

150. On March 9, 2009 the VDOC enacted a policy prohibiting inmates from ordering CDs/Music from any vendors except Jones Express Music (JEM). (See Exhibit J, pages 1+2)

151. Clem has twice tried to order CDs from Music By Mail but the orders were denied due to the JEM policy. (See Exhibit K, pages 1+2)

152. Prisoners have a First Amendment right to receive information and communicate with who they wish subject to limits reasonably related to legitimate penal interests.

153. The policy has denied Clem the right to receive Constitutionally protected CDs from MBM even though they were not available through JEM.

154. Courts have upheld many publisher-only rules for publications due to security considerations but Clem is unaware of such a rule allowing only one publisher.

155. MBM and many other businesses meet the VDOC's definition of "Approved Mail Order Source" pursuant to O.P. 802.1 (Offender Property).

## Unreasonableness and Exaggerated Response to Prison Concerns

156. The owner of JEM is a former VDOC employee. He has a contract with the VDOC and is rumored to be giving them "kickbacks".

157. CDs are small and hard to smuggle contraband in. When CDs arrive at VDOC facilities they are taken out and searched before being put in CD sleeves.

158. The Approved Mail Order Source rule is akin to a publisher-only rule and effectively prevented the smuggle of contraband by CDs.

159. Inmates may order books from MBM (which are much easier to smuggle contraband) but cannot order CDs from MBM.

160. An easy possible way to meet the regulation's goal, at a de minimis cost, but allow inmates to order CDs from other Approved Mail Order Sources, would be to inform inmates of all of the policies regarding CD orders, have staff disapprove orders that are non-conforming (as they already do), and reject any CDs that do come in and don't conform. This will be much easier ● when some of the policies are declared unconstitutional but are still easy now.

161. Another easy alternative would be to select a few other vendors and either enter into contracts with them or inform them of VDOC policies and allow inmates to order only from those vendors who agree to abide by them.

162. A combination of the two would almost certainly meet the regulation's goal, at a de minimis cost.

163. These alternatives become unneeded/easier if some of the CD policies are declared unconstitutional.

### Retaliation and Conspiring to Retaliate for Filing This Lawsuit

164. On September 16, 2010 at appx. 8:00am while Clem was asleep in his cell B221, Greer yelled to the control booth to open cell 21. He then yelled for Clem to come downstairs.

165. Clem went downstairs where Greer and Roberts were waiting near the first table.

166. As soon as Clem was downstairs Greer asked him what his problem was.

167. Clem said he didn't know what Greer was talking about.

168. Greer asked Clem again what his problem was.

169. Again Clem said that he didn't know what Greer was talking about and that he was just up in his cell asleep.

170. At this time Greer, who had been appx. 4-5 feet away, approached Clem in a manner he perceived to be aggressive and threatening, to within appx. 2 feet away.

171. He was standing close enough that Clem could smell his breath, feel his breath on his face, and even noticed Greer was chewing sunflower seeds.

172. Greer then said that he would personally stomp the sh## out of Clem if he did not drop his lawsuit against officers at this prison.

173. Greer further stated that they [the officers] don't have to get along with me [Clem] but that I had better get along with them.

174. Clem replied "I don't see it that way".

175. Greer immediately told Clem to turn around and put his hands behind his back. After Clem immediately complied he was handcuffed.

176. Officer Roberts had been standing slightly behind Greer and had been quiet the whole time.

177. As Greer and Roberts escorted Clem from the building to the medical segregation cell, Clem saw inmate T. Davis (Clem's cell partner at the time) and inmate A. Rivera at the fence talking to building Lieutenant D. Collins.

178. On November 25, 2010, during a visit with Lori Richardi, inmate T. Davis told Clem (who was sitting right next to him) that the morning Clem was "locked up" D. Collins told him that they were going to have to lock Clem up because he was "pushing too much paperwork" and if he (T. Davis) said anything he would get locked up too.

179. Lt. D. Collins is Greer's immediate supervisor, when Greer was B-building sergeant.

180. D. Collins is related to B. Collins by marriage or blood.

181. D. Collins was the officer who authorized Pre-hearing detention.

182. On September 9, 2010 defendants requested until September 17, 2010 to file a Motion For Summary Judgment because counsel was having difficulty obtaining an affidavit from B. Collins.

183. On September 13, 2010, B. Collins had her affidavit notarized.

184. On September 16, 2010, one day before the defendants filing deadline and the date defendants did file, Clem was retaliated against.

185. D. Collins, B. Collins, Greer, and Roberts conspired to retaliate against Clem.

186. Greer gave Clem a false disciplinary report against Clem for allegedly threatening him. The charge was dismissed on appeal.

187. Roberts allegedly "found" a razor blade when he packed Clem's property the morning he was locked up and gave him a false disciplinary report on it. The charge was dismissed at the hearing.

188. When Roberts brought Clem his property he refused to allow Clem inspect it.

189. Clem found many items missing including all of my lawsuit paperwork (all papers sent, received), 2 legal books, a dictionary, a $100 leather Bible, and other personal items. Clem was also not given a pen.

190. Clem borrowed a pen from the floor officer and filled out 2 emergency grievances, one relating to the threat/retaliation by Greer and one relating to the missing property by Roberts.

191. Clem tried to get at least 6 officers to sign the emergency grievances but none would.

192. Clem then went on a hunger strike that day, missing 20 consecutive meals, protesting these actions.

193. The night of September 16, 2010 Clem borrowed another inmates pen and informal complaint and filed the informal complaint on the threat/retaliation by Greer.

194. That night Clem also wrote brief letters to the following people, explaining everything: Warden Watson, Asst. Warden Kiser, Operations Officer Taylor, VDOC Internal Affairs, his mother, his father, and U.S. Magistrate Judge Urbanski.

195. On Sunday, September 19, 2010 Clem sent in two more informal complaints on the retaliation issue and missing property issue. He also sent in a Motion for a Preliminary Injunction regarding these issues.

196. D. Collins responded to both informal complaints and was the "Officer-in-charge" on the Disciplinary Reports.

197. When Clem's father called Warden Watson he was told D. Collins would come speak to Clem.

198. D. Collins involved himself as much as possible in order to cover this issue up.

199. On Monday, September 20, 2010 Asst. Warden Kiser and Lt. Fields came to speak to Clem about his hunger strike. Clem told them everything and they were able to recover Clem's missing property later that day.

200. Clem spent 47 days in segregation (12 of which was Isolation) behind these actions, which were intended to chill his rights.

201. On February 7, 2010 Clem wrote a Grievance on Greer and Roberts for serving him the wrong meal. The Grievance was deemed FOUNDED.

202. Greer and Roberts had a grudge against Clem for that.

## Claims For Relief

203. The actions of Cochrane and B. Collins, in depriving Clem of his publication without a reasonably related legitimate penological interest, but instead relying on unconstitutional orders, violated Clem's First Amendment right to freedom of Speech.

204. The actions of Cochrane, B. Collins, and Ravizee, in depriving Clem of his publication without giving him notice, a reason for, or an opportunity to be heard on the deprivation, violated Clem's Fourteenth Amendment rights to procedural and substantive due process.

205. The actions of Combs, in issuing orders to disapprove all Dungeons and Dragons books not based on their content but on his personal bias and unrelated to any legitimate penological interest, resulted in the deprivation of Clem's publication in violation of Clem's First Amendment right to freedom of speech.

206. The actions of Cochrane, B. Collins, and Combs, in conspiring to commit unconstitutional censorship of Dungeons and Dragons books, and resulted in the censorship of Clem's publication violated Clem's First Amendment right to freedom of speech and Federal Statutory rights under 42 U.S.C. §1985.

207. The actions or inaction by Johnson, Clark, Jabe, L. Collins, Wright, Jennings, Watson, Ravizee, Combs, and John and Jane Does, in actively disapproving or upholding a decision to disapprove any of the challenged publications, without a reasonably related legitimate penological interest, violates Clem's First Amendment right to freedom of speech.

208. The actions of Johnson, Clark, and Jabe, in creating and continuing a policy that prohibits the purchase (and possession) of non-music CDs, and through that policy the denial of Clem's order, without any reasonably-related legitimate penological interest or compelling government interest, and substantially burdening Clem's religious exercise, violated his First Amendment rights to freedom of Speech and Free Exercise of Religion, his Fourteenth Amendment right to equal protection, and his Federal Statutory rights under the RLUIPA.

209. The actions of Sgt. Young, in denying Clem's order for non-music CDs, violated Clem's First Amendment rights to freedom of speech and free exercise of religion and Federal Statutory rights under the RLUIPA.

210. The inaction of Jabe, Garman, Bivens, Watson, and Ravizee, in failing to remedy Clem's Grievance detailing a Constitutional violation, when they had a duty to do so, deprived Clem of his First Amendment rights to freedom of speech and free exercise of religion, Fourteenth Amendment right to equal protection, and Federal Statutory rights under the RLUIPA.

211. The actions of Johnson, Clark, and Jabe, in creating and continuing a policy that prohibits the purchase (and possession) of CDs with the "Parental Advisory: Explicit Lyrics" label, and through that policy the denial of Clem's orders, without any reasonably related legitimate penological interest, violates Clem's First Amendment right to freedom of speech.

212. The actions of Johnson, Clark, and Jabe, in creating and continuing a policy that interferes with communication and receiving information from CD vendors in the form of CDs, and through that policy the denial of Clem's orders, without any reasonably related legitimate penological interest, violates Clem's First Amendment right to freedom of speech.

213. The actions of Greer, in threatening and trying to intimidate Clem into dropping his lawsuit, and giving him a false disciplinary report for refusing to do so, constitutes retaliation in violation of Clem's First Amendment rights to petition the government for a redress of grievances and access to the courts.

214. The actions of Roberts, in providing additional support to Greer in attempting to intimidate Clem, giving him a false disciplinary report, and intentionally misplacing/withholding Clem's property (including all lawsuit materials and 2 legal books) constitutes retaliation in violation of Clem's First Amendment rights to petition the government for a redress of grievances and access to the courts.

215. The actions of D. Collins, B. Collins, Greer, and Roberts, in conspiring to retaliate against Clem for filing his lawsuit, violates Clem's First Amendment rights to petition the government for a redress of grievances and access to the courts, and Federal Statutory rights under 42 U.S.C. §1985.

216. The actions of D. Collins, in attempting to cover up the retaliation by filling out the pre-hearing detention form, being the officer-in-charge of the disciplinary reports, and summarily dismissing the informal complaints, violates Clem's First Amendment rights to petition the government for a redress of grievances and access to the courts.

22.

<u>Relief Requested</u>

WHEREFORE, Clem requests that the Court grant the following relief:

A. Issue a declaratory judgment stating that defendants violated Clem's rights as detailed in the Claims For Relief section.

B. Issue an injunction ordering Clark, Jabe, or their agents to:

    1. Repeal the policy on non-music CDs, explicit lyric CDs, and Centralized Music Management

    2. Allow Clem's CD orders that had been disapproved be approved

    3. Allow Clem permission to have 'Draconomicon' sent back in, if possible

C. Issue an injunction ordering Clark, Jabe, L. Collins, or their agents to:

    1. Remove all the challenged publications from the Disapproved Publications List

D. Award compensatory damages jointly and severally against all defendants

E. Award punitive damages against all defendants

F. Grant such other relief as it may appear that Clem is entitled.

I, Jason Clem, being duly sworn, deposes that the factual assertions in this complaint are true and that with the notarization below should be considered as an affidavit as they are in compliance with the requirements specified in Fed. R. Civ. P. 56(e).

Jason Clem   3-16-11
Affiant/Plaintiff

Sworn and subscribed to before me, a Notary Public, in and for the State of Virginia, on this 16th day of March, 2010.

Jason Clem #1185220

Notary Public

My Commission expires: 12/31/13

R. E. FLEENOR
NOTARY
PUBLIC
REG. #341429
MY COMMISSION
EXPIRES
12/31/13
COMMONWEALTH OF VIRGINIA